The next case for argument is 20-2121, Luoyang Bearing Corporation v. United States. Mr. Lee, whenever you're ready. Thank you, Your Honor. Good morning. My name is Adam Lee with the law firm Harris-Bricken. I am here today on behalf of Luoyang Bearing Corporation. We are appealing a Department of Commerce anti-dumping administrative review proceeding on tapered roller bearings from China, an order that was issued back in 1990, over 30 years ago. Our case involves two issues. Luoyang Bearing Company had their separate rate status denied in the 2016-2017 administrative review. We are appealing that denial of separate rate status, and we are appealing the Court of International Trades' decision not to review Commerce's denial because of failure to exhaust administrative remedies. Okay, Mr. Lee, this is Judge Prost. But I think the heart of the case, so correct me if I'm wrong, is your problem was you failed to exhaust your remedies, and your defense of that is futility. So let me just start off about that and say, couldn't you have made the merits arguments that you make here to Commerce in a brief prior to Commerce's final determination? You argue here that they ignored record evidence that was relevant, but that's why you should have raised it in the case brief before Commerce. Isn't that right? Yes, Your Honor. I think, you know, I am in the unfortunate position where I was not counsel to Luoyang in the Commerce proceeding or the Court of International Trade proceeding, and I am dealt with the factual cards that I have in hand. I do agree that they could have, and perhaps should have, filed there a case brief to make these points. However, the argument is that even if they had made the arguments, it wouldn't have changed the outcome, because the outcome was already preordained and was irrebuttable, regardless of even if they had submitted the arguments. Well, how do we know that for sure? I mean, how are we supposed to divine that here at the appellate level that there was absolute certainty that nothing would have exercised if you had followed procedure? I think, fundamentally, our argument is based on the fact that since the Court's decision in Advanced Tech Materials, the Diamonds Gallblade final cases back in 2013-2014, Commerce changed their separate rate status. Before then, many Chinese companies with state-owned companies involved in the ownership chain, including Luoyang Bearing, were granted separate status. But since Advanced Tech came out and the change of Commerce's separate rate status, there has been not one single case in which Commerce has even granted or even hinted at granting separate status if there is a finding of a majority ownership held by a state-owned company anywhere in the ownership chain. So, if there was but one case that we could... What was the date you cited, Mr. Lee? Did you say since 2014? 2014-13. The Advanced Tech decision came out, I believe, in 2013. Commerce, after that case, began modifying their separate rate analysis to where it stands right now. And so, basically, the cases in which they ruled against majority ownership by a state-owned company effectively began in 2014. Your view is that it should be a multi-factor test? Well, our view is that the separate rates analysis, this is going back to the original SPARQLESS test. Answer my question. Is your view that it should be a multi-factor test? Yes, because Commerce's separate rate analysis before Advanced Tech and even now still is on phase, a multi-factor test. It's a de jure analysis first and then a de facto analysis, which specifies four specific criteria that should be analyzed. So, if you presented that to Commerce, isn't it possible that Commerce would say, even under the test that you propose, the multi-factor test that you propose, you lose, right? And you have the opportunity to do that. I think since 2015, there have been numerous instances where companies have argued that. Wait a second. Your job is to listen to the question and try to answer the question rather than to go off in some tangent. What I'm asking you is, isn't it possible that if you presented this to Commerce, they would say, even under your test, you lose because we're making findings that under the multi-factor test, you still lose, right? Our position is that in this instance, no, it was not possible. How do we know that? How do we know that that's what Commerce would say? So, our position is that the track record, given the unanimous, the unbroken stream in which Commerce has denied separate status, any time there has been majority ownership by a state-owned company is our basis for saying that Commerce has not and will not change going forward. Okay. This is Judge Clevenger. The de facto test has four parts. And the part that you're challenging is the part that says that the exporter has to prove that its management is independent, essentially that its management is independent of the Chinese government. And what Commerce is, is where there's a showing that the Chinese government in corporate structure has the authority to pick the management of an exporter. Then there's a presumption that the Chinese government does so. And in each of the cases you have cited, I've looked at all of them. In almost all of them, there was an attempt by the exporter to show, as a matter of fact, that the Chinese government did not exercise its influence to choose the management. So, what would have happened in this case, if you had chosen to present your evidence to Commerce, you could have said, you realize that because of your corporate structure, there is a presumption that the Chinese government picks your management or can pick your management. You could rebut that because you can go to your management and ask them how they get picked. Your own management will know whether it was put in place by the Chinese government or whether it was independent and independently picked and therefore autonomous. And so, you in essence hold, so to speak, the keys to the jailhouse door. And you had an opportunity to come into the agency and teach and show them just that, that your management was independently selected and with no input from the Chinese government, but you waved off that opportunity. And if you put that evidence in the record for what you thought showed autonomy, and Commerce disagreed with you, you would have been able to appeal to the CIT, ask it to balance that evidence, and if you lost there, you could have come to us. And I think that's what exhaustion of administrative remedies is all about. Yes, Your Honor. Those definitely are valid points. I think our position is that when you look at all those cases in which the Chinese respondents did appeal, did file a case brief, did file a CIT appeal, and were able to argue the case brief acts as submitted below, Commerce still unanimously rejected those attempts to disprove the Chinese government control through the majority shareholding. That's true, because they failed to meet their burden to overcome the presumption. Now what you're trying to argue is, as a matter of law, that this, I think it's number three, the third element of the four-part test, but you know which one we're talking about. I think you're arguing that either an irrational and capricious standard, or you're arguing that the presumption that that standard, unless it's overcome, is somehow arbitrary and capricious. But even that kind of legal challenge to the authority of the agency to apply the third problem as they've done seems to be a matter that should conditionally be presented to the agency so that its response will form part of the debate when it comes in front of a judicial forum. Yes, your honor. I think these are all duly noted, and we do appreciate the administrative process in which the agency is supposed to have the first crack at handling these issues before it gets appealed up to the courts, but we're appealing because of the judicial discretion under the Exhaustion Claim to, gee, is the separate rates test being administered fairly? Are the presumptions giving a fair opportunity for respondents to try to rebut? We submit that. Your suggestion that the exporter doesn't have the opportunity to try to rebut is frivolous, because the record proof of every single case you cited, except one, shows that the exporter showed up at the agency that you did not in order to make your case. And the fact that no one has ever rebutted the presumption doesn't prove that the presumption is wrong, does it? It could. That's essentially what we're asking. Why don't we hear from the other side? Ms. Kristeiniak? Thank you, your honor, and may it please the court. We ask that the court affirm the decision of the trial court requiring the exhaustion of administrative remedies here. As the court noted, Liu Yong did not file a case brief, so it's not a question of whether an issue was somewhat raised before commerce, but it simply was not raised at all. We think that this case falls squarely within this court's binding precedent in both Korrestal from 2007 and in Totu Builders from 2013. In Korrestal, this court noted, quote, the mere fact that an excuse a party from statutory or regulatory requirements that it exhausts. This is Judge Prouse. Can I just interrupt you for a second? I don't know if you heard the preceding argument. I did, your honor. Well, I mean, as you might have gleaned, I mean, that's an instance where this court has a precedent that's binding on all future panels and can only be overturned by an en banc court. So they bring it to us first. I think under our rules, you can file a petition for hearing in those circumstances and get right up to us without necessarily going the panel route. Is there such a procedure available in your sphere that would allow that? I mean, if there's been an absolute binding precedent that goes against you, does one have to exhaust all of the details knowing he's going to lose? Is there a way in which the petitioner someone should be able to lie that and just go up for the answer to the body that has the authority to overturn it? I think the court's decision in Otoku Builders is an instance where this court found that the trial court abused its discretion in requiring the futility or not applying the futility exception to the requirement. In that case, it was commerce made the determination to rescind the review over certain steel products. And Otoku, which participated in the earlier parts of the process, argued that the rescission should be further dated back to include certain entries that had already been reviewed. Commerce made it clear in those initial proceedings that its understanding of the applicable statute there meant that it did not believe the statute would permit it to ever rescind a review over an already reviewed entry. Otoku did not repeat that argument after the preliminary determination. And the trial court found that it had failed to noted that had Otoku just simply refiled the same comments that it had initially filed, that would have worked to preserve the argument. And here, this court reversed that decision, finding that because commerce's determination hinged on its understanding of a statute, that was a legal determination that could be appealed straight up and did not have to be necessarily decided by commerce. In contrast, what we have here are a factual determination applied to policy. The presumption of government control is not set forth in statute, right? It's a commerce policy that has been developed over several years. It has been reviewed and affirmed by this court in the AT&M cases that counsel referred to, but then also in the Diamond Sawblades decision from 2017, determining that the presumption is something that commerce may, that commerce has been affirmed. And I would note specifically the court held in Coruscant that the finding there that the exhaustion requirement was not, that the exhaustion requirement was mandated was because the issue there was not dictated by statute or regulation, and I'm quoting from the decision, but was the product of policy decisions worked out by commerce and applied in other cases. And I think the facts of Coruscant are important here too, because there they were making a very similar argument. The argument was essentially, because of the way commerce calculates duty absorption, it's essentially impossible for an importer to be found to be dumping and then not also found to be absorbing, duty absorbing. It was kind of a de facto finding that their argument was based on the way that commerce calculated duty absorption. And this court said, again, noted the mere fact that an adverse decision may have been likely did not excuse them from raising that to commerce because it was not a statute or regulation that commerce was applying, but rather commerce's internal policy, that it may have, again, language from the decision. Commerce is not bound to adhere to the approach it employs if a sufficiently pervasive, persuasive showing is made that approaches flawed in general or in its application to a particular case. That's what I believe some of the questions to opposing counsel are getting at, that even notwithstanding the fact that perhaps commerce has not found this particular ownership structure to rebut the presumption of government control does not mean that commerce would not, it is impossible for commerce to look at the specific facts of a case and find that the presumption has been rebutted. I'll actually note that this court quite recently in a decision that just came out last December, and I believe the Dillinger-France decision noted, quote, a presumption is not irrebuttable where commerce considers objections to its methodology and provides its reasons for rejecting them. And that is precisely what we have here. Ms. Christina, just as an information point, since Diamond Saw Blades and the fact that the ownership structure is being held against the export of where the ownership shows possible government control, has an exporter ever rebutted the presumption in any of these cases? Many exporters have rebutted the presumption. I looked at maybe 60 of them. Every single one I saw, the exporter was allowed to come in and make arguments as to why they thought the presumption of control over management. It's all lost. I'm just curious, is there one that the exporter has won? So, the presumption applies to all importers. Many importers do rebut. You understand my question, so you can either answer yes or no. In all of these cases, such as this one, commerce gives, says to someone, your ownership structure looks for trade government controls to begin with your management. Therefore, we presume your control, and therefore, you can either say no. And the purpose of this case is to come in on the facts. We aren't determining who really is autonomous. I'm just asking, has such an exporter in the 60 or 70 cases ever succeeded? I am not aware of an instance where, with a particular ownership structure like we're looking at here, your honor, there has been a finding of a rebuttal of the presumption of government control. But I think it's worth discussing briefly. Yeah, I mean, what's the one that the ownership structure was a little different, than what it was in terms of trade control? The exporter prevailed, as he went through this case. Your honor, I apologize. It might be my connection, but I could not hear your question quite clearly, if I could ask you to. Well, you answered my question by saying no. With the ownership structure present in this case, you've never seen one that prevailed. I'm asking you if you had a situation where there was a ownership structure that the exporter prevailed. Again, your honor, I'm not aware of one, because the way the Chinese government sets up these corporations is that the SASAC, which stands for the State Owned Assets and Supervision Administration, I believe oversees almost every corporation there. And specifically in this in undertaking these analyses, assumes that a majority shareholder is going to act in their interest, unless there is something within the applicable bylaws or articles of association, something that would bar them from acting in their interest. And that is not the case here. We just had a simple situation where the SASAC 100% owns the majority shareholder, and there's no limitation on the majority shareholder's ability to select management, or excuse me, to select the board, which Commerce noted, and this finding is in appendix page 40 in the preliminary determination memo. Commerce noted that by virtue of the ability to select the board, the board selected management. So I'm not sure if I've answered the court's question, but no, I'm not aware of a circumstance where a company that is majority owned by some sort of government entity like we have here has successfully rebutted the presumption. But again, based on this court's precedent from Coruscant, that is not a requirement for the presumption to stand. Well, I'm a little confused here, I confess, as to what the presumption is. As I understand it, their presumption is that if it comes from an NME country, that it's government controlled. That's the presumption which was discussed in Diamond that if it's government owned, that means it's government controlled. No, Your Honor, I believe that's the presumption that plaintiff appellant is asserting here, basically, that there is a presumption that if the SASAC is somewhere in the ownership structure, therefore, the assumption of government control cannot be rebutted. That is not a presumption on Commerce's part. And the court has, of course, the Commerce does not simply stop the analysis at, and we see the SASAC in the ownership structure, therefore, the rebuttal has failed. Rather, they continue, and again, this is at appendix page 40, they just continue to discuss the actual structure there, noting that there is no limit on the majority shareholder's ability to select the board, which in turn selects management. So if the government has ownership, and there's no limitation in the bylaws that restricts their ability to select management, then there's government control, regardless of other factors, right? That is Commerce's practice, which was affirmed by this court in Diamond's law. Yes, Your Honor. If there's no further questions on the presumption of control, I'll briefly touch on the standard of review here. As our brief noted, the standard of review applicable is not substantial evidence as argued by plaintiff appellant, but rather abuse of discretion. We'll note that plaintiff appellant has not really articulated any sort of argument as to what the abuse of discretion of the trial court was here. Rather, it seems to emphasize really just the factual record and what it thinks Commerce should have determined back at the administrative level. So we think in addition to the binding precedent in Coruscant in the totu, which plaintiff appellant really does not engage with in its briefing, the mere fact that plaintiff appellant has not enunciated a legal theory under or any sort of theory under which the trial court abuses discretion underscores why this court should affirm the decision of the trial court. Could you help me? Where in Diamond Sawblades did we approve the that Commerce is applying? The rule that... Well, you're saying that government ownership is the end of it unless the bylaws say that ownership doesn't give you the right to select management. Where in Diamond Sawblades did we approve that rule? I apologize, Your Honor. I did not mean to imply that that was the specific finding in Diamond Sawblades that this court affirmed. Rather, I was referring to the language on 1311 of the court's decision, which we also quote in our brief that essentially says, if a company fails to rebut the presumption, it will receive the single statewide dumping rate. And then within that decision, the court analyzed the structure that Commerce has developed with regards to the actual du jour and de facto. So it didn't approve the rule that you say Commerce applies? No, Your Honor. And I want to clarify that that is... Yes, Your Honor. And I apologize if what I said was misleading. It's rather the structure of the presumption of government control with the de facto and du jour that this court did review and affirm in the Diamond Sawblades decision. And if there are no further questions, we respectfully ask that the court affirm the decision of the trial court. Okay. Thank you. Mr. Deprest, you've got two minutes, three minutes if you have anything to add. Hello? Do you have your mute on? Thank you, Your Honor. I just disconnected the mute. There's one thing I would like to add. I believe that might be instructive for the court to consult the joint appendix. And at the joint appendix on page 94 to 104, there is a very lengthy and detailed discussion of the SRA decision for another company that was under review, say, Jang. And the discussion it takes 10 single-page pages that includes very detailed discussion, includes graphs of the company structure. And the reason I point this out is that is what we are... Essential type of analysis, detailed analysis, that is exactly what we are missing in this case because of the appellant's decision to not file a case brief and to not give Commerce a chance to address the arguments that it now believes are so important. So, obviously, lacking this discussion from Commerce violates the principle that the agency should have the first crack at this. It also makes the review by the court very difficult because we should leave it to the agency to present the details of the record, not place it on the responsibility on the court to examine these complicated records such as this involving the management of a company in China. Then the other thing that I would like to add is the importance of the agency's regulation apart from the more general... Mr. DePriest, if the government is applying a rule that ownership is in itself conclusive unless the bylaws prevent the owners from selecting management, why isn't that a pure legal rule that can be reviewed without compromising the exhaustion principle? Well, I don't think the agency has a rule like that. I think the agency's position that they... When the government says it does, it's not right? No, I think what I meant was the agency is simply recognizing that the moment that you have evidence that a company is being owned by the Chinese government, then that makes it very likely that the Chinese government will, in fact, exercise control. And then what the government does, just like it did for Zhejiang in our case, it examines all the aspects of the ownership and it examines how the rights that are inherent in that ownership are being exercised and it examines, as a government counsel stated, if there are limitations. It examines a host of factors to see whether there is any reason to depart from the common sense conclusion that if I own a company, it means I have control over the company. You're describing a rule which is not the one that government counsel says they apply. Government counsel says they apply a rule of government ownership is conclusive unless there's a bylaw that prevents them from selecting management. Unless there is a bylaw, but the government is not saying that is the only thing that could stop it. There may be... It's hard to predict what the factual situation will be for any particular company in a review, but all I can say is I have 10 pages of analysis of Zhejiang that doesn't suggest to me that it is an immutable conclusion or that there's no chance ever that the Commerce Department will not reach a different conclusion. Okay. Anything else, Judge Dyke? Any further questions? No. Okay. Mr. Lee, you have a few minutes on rebuttal. Thank you, Your Honors. Two points to make. The last point on the other respondent, Zhejiang Machinery, I know that ironically I'm actually representing them in the CIT appeal of that decision. Commerce actually did also deny separate status for them as well, too. There were, as Mr. DeForest noted, several factual distinctions there. So in terms of how the ownership was structured for Zhejiang, it was different. And so it was different enough that there were enough factual differences that they considered appealing in that case. But here for Luoyang, because it was the cookie-cutter straight-up ownership by a state-owned company, that has become an automatic basis for denial. What were the factual differences in the other case that caused them to go through this elaborate analysis? For Zhejiang Machinery, the state ownership was just a proxy. It was not an actual owner. It was a proxy for an ESOP, an Employee Stock Ownership Program plan, that were the true shareholders of that company, the Zhejiang Machinery affiliate. So in that case, the question really was, is it really a state-owned company controlling this, or is it really the employees through the ESOP that's controlling the company? So that was the key factual distinction for the other TRV company in this review. So I guess you noted that commerce has effectively established a second layer of presumptions. In addition to the first underlying presumption of Chinese government control of all companies, here, majority state ownership is basically a de facto presumption of control of the management. So like an onion, this extra layer of a presumption, that's what we're challenging, is that because the underlying burden to prove independence from Chinese government is already upon us, this extra burden trying to overcome the majority state ownership anywhere in the corporate structure is an unfair presumption to apply. Okay, thank you. We thank both sides, and the case is submitted. That concludes our proceeding for this morning. Thank you all. Thank you, Michael. Bye. The honorable court is adjourned until tomorrow morning at 10 a.m.